

FILED ✓     RECEIVED
ENTERED     SERVED ON
COUNSEL/PARTIES OF RECORD

AUG 2 2 2017

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Fabian Fuentes Rosas

    Petitioner

v.

E.K. McDaniel, et al.,

    Respondents

3:05-cv-00490-RCJ-VPC

**Order of Dismissal**

[ECF No. 110]

Petitioner Fabian Fuentes Rosas, a prisoner in the custody of the State of Nevada, brings this habeas action under 28 U.S.C. § 2254 to challenge his 2000 Nevada state convictions resulting from a double homicide at a Domino's Pizza store. (ECF No. 68). After evaluating his claims on the merits, I deny Rosas's petition for a writ of habeas corpus, dismiss this action with prejudice, and deny a certificate of appealability.

### Background

Just past midnight on May 24, 1997, a man walked into a Domino's Pizza store in Elko, Nevada, and shot two employees. Later investigation revealed that roughly $400 was missing from the register, but that some cash was left behind.

Rosas was indicted on July 13, 1999 for the murders and related conduct. (Exhibit 199).[1] On

---

[1] The exhibits referenced in this order are found in the Court's record at ECF Nos. 12–16 (Exhibits 1–189), ECF No. 33 (Supplemental Exhibits 190–202), and ECF Nos. 64–65 (Exhibits 203–256).

1

September 18, 2000, Rosas was found guilty following a jury trial of two counts of murder in the first degree with the use of a deadly weapon, one count of conspiracy to commit murder, one count of robbery with the use of a deadly weapon, and one count of conspiracy to violate the Uniform Controlled Substances Act. (Exhibit 18, at 2–3). He was sentenced to multiple consecutive sentences of life in prison without the possibility of parole, in addition to other consecutive sentences. (*See id.* at 4).

Rosas appealed, and the Nevada Supreme Court affirmed on December 17, 2001. (Exhibit 138). Following a petition for rehearing, an amended affirmance was filed on May 10, 2002. (Exhibit 140). On August 7, 2002, Rosas mailed a state petition for a writ of habeas corpus, and it was denied on June 24, 2003. (Exhibit 147; Exhibit 172).

Rosas then filed a *pro se* habeas action in federal court under 28 U.S.C. § 2254. (ECF No. 7). Following appointment of counsel, (*see* ECF No. 22), Rosas filed a First Amended Petition for a Writ of Habeas Corpus on November 20, 2006. (ECF No. 32). On September 16, 2008, in response to challenges raised by the State, this Court granted a stay of to allow Rosas to further pursue and exhaust claims for post-conviction relief in state court. (ECF No. 61).

Rosas filed a second state petition for habeas relief on November 3, 2008. (Exhibit 203). It was denied on February 1, 2011. (Exhibit 237 (proposed findings); Exhibit 240 (adopting the proposed findings)). Rosas appealed, and the Nevada Supreme Court affirmed. (Exhibit 247). Remittitur issued on March 4, 2013. (Exhibit 255).

Rosas then returned to this Court and filed a motion to reopen on April 17, 2013 and to file a second amended petition. (ECF No. 63). This Court granted the motion. (ECF No. 67). Rosas filed his Second Amended Petition for a Writ of Habeas Corpus. (ECF No. 68). The Second Amended Petition raised ten grounds for relief:

> Ground One: Rosas was denied his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendment[s] when the State prosecuted him for the Domino's murders in breach of the plea agreement precluding such prosecutions. (ECF No. 68, at 14–22).
>
> Ground Two: Rosas was denied his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendments when the district court denied his motion to

dismiss the case on the grounds that the State was precluded from prosecuting Rosas due to a prior negotiated plea/polygraph agreement. (ECF No. 68, at 22–31).

Ground Three: Rosas was denied his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution when the prosecutor raised and impeached an alibi defense in his case in chief, thereby improperly shifting the burden of proof to the defendant. (ECF No. 68, at 31–34).

Ground Four: Rosas was denied his right to the effective assistance of appellate counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to [challenge] the prosecution's use of a peremptory challenge to exclude a Hispanic from serving on the jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (ECF No. 68, at 34–38).

Ground Five: Rosas was denied his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to move for a change of venue after a prospective juror informed the court and counsel that Elko, Nevada's white and Mexican communities were racially split as to Rosas' guilt of the crimes charged, the former favoring convictions and the latter acquittals. (ECF No. 68, at 38–40).

Ground Six: Rosas was denied his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to investigate (1) a leading suspect in the killings and (2) a witness who could have impeached Liana Marie Barraza, and therefore, failed to prepare a meaningful defense. (ECF No. 68, at 40–43).

Ground Seven: The State's failure to disclose (1) the prosecution of J.J. Arnold Horner as an ex-felon in possession of a 9mm pistol during the summer of 1997, and its consequent seizure of such 9mm pistol and destruction thereof at closure of the case and (2) the investigation of Horner for stealing dynamite and threatening various persons and institutions with it denied Rosas his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution. (ECF No. 68, at 43–44).

Ground Eight: Admission of prior bad act testimony violated petitioner's constitutional rights to a fair trial and due process of law under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 68, at 44–47).

Ground Nine: Rosas was denied his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution because there was insufficient evidence presented at trial to support a finding of guilt of the crimes charged beyond a reasonable doubt. (ECF No. 68, at 47–49).

Ground Ten: Rosas was denied his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to object to the joinder of the controlled substances conspiracy charge (Count 9) with the previous eight counts concerning the Domino's Pizza killings. (ECF No. 68, at 49–50).

The State moved to dismiss the Second Amended Petition. (ECF No. 78). The State argued

3

that a number of claims had not been exhausted in state court, were untimely because they did not relate back, or were procedurally barred because they were procedurally defaulted in state court.

This Court rejected the first two of these arguments, holding that Ground Eight had been exhausted in state court and that Grounds Five, Seven, Eight, and Ten were not untimely. (ECF No. 86, at 8). Addressing the State's final argument, this Court held:

> Because Grounds One, Two, Five, Six, Seven, and Ten of the second amended federal habeas petition assert the same claims made in the procedurally defaulted state court habeas petition, these claims are procedurally barred from federal review and will be dismissed with prejudice unless petitioner can show cause and prejudice to excuse the procedural bar, or that this Court's failure to consider the defaulted claims will result in a fundamental miscarriage of justice.
> . . . .
> The Court has determined that the analysis of cause and prejudice arguments in this case are closely related to the analysis on the merits of the case. Therefore, the Court will defer on ruling on [the] cause and prejudice issue until the merits are fully briefed.

(*Id.* at 10–11).

The State filed its Second Amended Answer. (ECF No. 94). Rosas filed his Second Amended Reply. (ECF No. 103).

### Standard of review

When a state court has adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.* at 181–88. The petitioner bears the burden of proof. *Id.* at 181.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the

decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* The Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* And "a federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. A decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *See, e.g., id.* at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). When a state court's factual findings based on the record before it are challenged, the "unreasonable determination of fact" clause of 28 U.S.C. § 2254(d)(2) controls, which requires federal courts to be "particularly deferential" to state court factual determinations. *See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court's factual findings are presumed to be correct and the petitioner must rebut that presumption by "clear and convincing evidence." In this inquiry, federal courts may not look to any factual basis not developed before the state court unless the petitioner both shows that the claim relies on either (a) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or

(b) "a factual predicate that could not have been previously discovered through the exercise of due diligence" and shows that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

**Discussion**

**A.    Ground 1**

In Ground 1, Rosas argues that he "was denied his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendment[s] when the State prosecuted him for the Domino's murders in breach of the plea agreement precluding such prosecutions." (ECF No. 68, at 14). Sometime prior to August 21, 1997, Rosas was charged with three drug felonies. After that, Woodbury, the Elko County District Attorney, approached Leeds, Chief Deputy Elko County Public Defender, about whether Rosas would take a polygraph examination concerning Rosas's involvement in or knowledge of the Domino's homicides. Rosas, assisted by Leeds, reached and signed the following "Agreement to Take Polygraph Examination":

> I, (Fabian Rosas) after consulting with my attorney, Frederick H. Leeds, have agreed to take a polygraph examination with respect to the Domino's killings. Mr. Leeds has advised me that I do not have to take this examination and I am doing so freely and voluntarily.
> I have been advised that if I take the examination and it shows that I am not involved in the Domino's killing; the Elko County District Attorney's Office has agreed to file no further charges and take no further prosecutorial actions with regard to the charges that I am currently facing.
> Lastly, under no circumstances may the results of, or the fact that a polygraph examination was administered, be referred to in any subsequent prosecution, without subsequent written approval of all parties signatory to this agreement.

(Exhibit 202 (as in original)). The agreement was signed by Rosas, Leeds, and Woodbury. (*Id.*).

Two years later, in 1999, the district attorney's office brought the homicide charges. Rosas claimed that doing so was in violation of the polygraph agreement, and it became an issue for the trial court in July 2000. On July 25, 2000, Woodbury signed a declaration that "[t]here was no written memorandum." (Exhibit 42, at 6). Two days later, Woodbury cross-examined Leeds about the agreement:

6

| | |
|---|---|
| Q: | The fact is the agreement that you think we reached was never reduce to writing? |
| A: | That's correct, it wasn't. |
| Q: | And did you take any notes? |
| A: | That's—well, let me think about that. I didn't take any notes with respect to what? |
| Q: | This negotiation that you say you and I had. |
| A: | That's correct. |
| Q: | And I didn't take any notes? |
| | . . . |
| A: | . . . I didn't see you take any notes. |

(Exhibit 45C, at 88). In answering Rosas's appeal of his convictions, the State again relied on Woodbury's affidavit and the testimony he elicited from Leeds. (*See* Exhibit 134, at 3–5).

When Odiaga raised this Ground to the Nevada Supreme Court, the court held that the petition was procedurally barred, untimely, and an abuse of the writ. (Exhibit 247). This Court then held that Ground 1 was procedurally defaulted based on independent and adequate state grounds, and that, after the merits issues were fully briefed, it would be "dismissed with prejudice unless petitioner can show cause and prejudice to excuse the procedural bar, or that this Court's failure to consider the defaulted claims will result in a fundamental miscarriage of justice." (ECF No. 86, at 10).

This standard comes from Supreme Court case law. The Supreme Court has held that, to overcome a claim that was procedurally defaulted in state court, a petitioner must establish cause for the default and prejudice attributable thereto. *Harris v. Reed*, 489 U.S. 255, 262 (1989).[2]

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The external impediment must have prevented the petitioner from raising the claim. *See McClesky v. Zant*, 499 U.S. 467, 497 (1991). If the petitioner fails to show cause, the court need not consider whether the petitioner suffered actual prejudice. *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Roberts v. Arave*, 847 F.2d 528, 530 n.3 (9th Cir. 1988). With

---

[2] Under *Harris*, a petition could also show that not reviewing the state court's error would result in a "fundamental miscarriage of justice." *Harris*, 489 U.S. at 262 (citations omitted). This standard is met only if the petitioner shows it more likely than not that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Murray*, 477 U.S. at 496). Rosas does not argue that he falls under this exception to overcome his procedural defaults. Even if he did, such an argument would fails for the same reason that Ground 9 fails.

respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Rosas argues that the actions, described above, of the state officials in creating the belief that the polygraph agreement was never reduced to writing constituted cause to excuse Rosas's failure to provide the polygraph agreement. (*See* ECF No. 103, at 14–20).[3] The Supreme Court has held that a qualifying objective factor that constitutes cause is "'interference by officials' that makes compliance with the State's procedural rules impracticable." *McClesky*, 499 U.S. at 493 (quoting *Murray*, 477 U.S. at 488).

Before addressing that argument, though, this must first address the nearly two-year wait between Rosas finding the written agreement and raising it to the Nevada state courts. That wait was not attributable to the state officials' actions, or any external impediment at all. Rosas contends that cause exists here because the written agreement was found while he was in the midst of federal habeas proceedings. But that is not "interference by officials." That was a choice. In fact, the Nevada Supreme Court has made clear that "the pursuit of federal remedies does not constitute good cause." *Flanagan v. State*, No. 63703, 2016 WL 4005696, at *1 (Nev. July 22, 2016) (unpublished); *see Colley v. State*, 773 P.2d 1229, 1230 (Nev. 1989), *superseded by statute on other grounds as recognized in Flanagan*, 2016 WL 4005696.

Moreover, even if this Court were to look only at the time between the entry of judgment in the case and the finding of the written agreement, there would be insufficient cause. The officials here did not destroy any evidence; instead the lower state court found that the state officials—much like Rosas's own attorneys—simply forgot that the agreement had been reduced to writing. Indeed,

---

[3] Rosas also argues that the procedural default rule applied by the Nevada Supreme Court does not meet the "adequate and independent state grounds" test. (*See* ECF No. 103, at 20–27). But this Court already decided that it does, and that the only out for Rosas was falling into one of AEDPA's two exceptions. (*See* ECF No. 86, at 10).

8

Rosas and Rosas's current attorney both signed the document and thus should have known that it had been reduced to writing and Rosas's former attorney had the original document in its case file for one of the three previous drug cases out of which the polygraph agreement arose. While compliance with the State's procedural rules might have been slightly hampered by the state officials' actions, it was not rendered "impracticable."

Therefore, Rosas had not demonstrated "cause" to overcome the procedural default, and Ground 1 provides no basis for habeas relief.

**B.    Ground 2**

In Ground 2, Rosas argued that he "was denied his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendments when the district court denied his motion to dismiss the case on the grounds that the State was precluded from prosecuting Rosas due to a prior negotiated plea/polygraph agreement." (ECF No. 68, at 22). Ground 2 is effectively the same as Ground 1, minus the exhibits (190, 191, 198, 199, and 202) that led this Court to find that Ground 1 was unexhausted—thus, it is the same claim that was decided on the merits by the Nevada Supreme court. (ECF No. 103, at 65). So, Rosas says, "This Court has never found Ground Two of the Second Amended Petition to be procedurally defaulted." (*Id.*). But this Court has. Indeed, it wrote: "Ground[] . . . Two . . . of the second amended federal habeas petition . . . [is] procedurally barred from federal review . . . ." (ECF No. 86, at 10). And the reason for that is clear: notwithstanding the mental gymnastics that Rosas tries to put this Court through, Ground Two, in Rosas's own words, relies on "the existence of the [polygraph] agreement [being] added to the equation." (ECF No. 103, at 67–68).

But even overlooking this procedural default would not give Rosas any shelter. Rosas argues, in the alternative, that the Nevada Supreme Court "violate[d] 2254(d)(2) because it is based on an unreasoanble determination of fact—the lack of an agreement. There is no question the agreement did in fact exist . . . ." (*Id.*). The only reason that there is now no question that the agreement did in fact exist is that we have the written copy of it. But evidence not presented before the state court cannot be used to bolster an argument that the state court made an unreasonable

interpretation of fact under § 2254(d)(2). *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). Without this written agreement, Rosas does not even try to argue that the Nevada Supreme Court's factual determination that there was not agreement to not prosecute Rosas was unreasonable. For good reason, too. Such an argument fails because the determination, based on the evidence presented to the Nevada Supreme Court, was not unreasonable.

And Rosas cannot use the written agreement to meet the clear and convincing evidence standard of § 2254(e)(1), either, because that requires that the evidence not presented to the state court "could not have been previously discovered through the exercise of due diligence." As mentioned above, the state trial court found that both the prosecution and the defense simply forgot about the existence of the written plea agreement. Based on the record, that was not plainly erroneous. And even if it were, while defendants can rely on a prosecution's belief that there is no such evidence in a *Brady* context because due diligence is not required, *see Banks v. Dretke*, 540 U.S. 668, 695–96 (2004), the same is not true for AEDPA. Due diligence surely could have revealed the existence of the document, and this bars its introduction for the first time in federal court.

Ground 2 provides no basis for habeas relief.

## C.     Ground 3

In Ground 3, Rosas argues he "was denied his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution when the prosecutor raised and impeached an alibi defense in his case in chief, thereby improperly shifting the burden of proof to the defendant." (ECF No. 68, at 31). As part of Nevada criminal procedure, a criminal defendant is required to provide the State with notice of any alibi that the defendant might use at trial. *See* Nev. Rev. Stat. § 174.233. Here, Rosas did just that. (*See* ECF No. 68, at 31). In response, the State used its opening argument, case-in-chief, and closing argument to rebut and discredit any story that Rosas was elsewhere as described in the alibi notice. (Exhibit 83, at 230–35; Exhibit 104, at 1664–69). The State called Rosas's putative witnesses and impeached their credibility. (*See, e.g.*, Exhibit 91, at 941–50, 1025; Exhibit 93, at 1016–25, 1050–53, 1082–83, 1123–42). Rosas did not try to establish an alibi during the trial by calling any of these witnesses. The jury was not given any

10

specific jury instruction on alibis to make clear that, even though the State was calling witnesses who claimed that Rosas was elsewhere during the time of the homicides and impeaching them, the burden was with the State to prove all elements of the crime beyond a reasonable doubt.

To the Nevada Supreme Court and to this Court, Rosas argued that this violated both his Fifth and Fourteenth Amendment rights. Rosas asks this Court to review the claim of burden-shifting de novo because, in his view, the Nevada Supreme Court addressed only whether the State violated Rosas's right to remain silent, not his right to a fair trial. But this particular line of argument (that the Nevada Supreme Court did not address the question presented entirely) was raised for the first time in Rosas's reply, not in his Second Amended Petition. That is too late. *See, e.g.,* *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Indeed, in his Second Amended Petition, Rosas conceded that "[t]he Nevada Supreme Court ruled on this claim on its merits." (ECF No. 68, at 31).

It is clearly established that the burden of proof may not be shifted to the defendant on whether the defendant has an alibi. *See, e.g., Estelle v. Williams*, 425 U.S. 501, 503 (1976); *In re Winship*, 397 U.S. 358, 364 (1970). No one disputes that. And no one disputes that it is clearly established the State here had to prove beyond a reasonable doubt Rosas's presence and participation in the homicide and that the State could not shift that burden of proof onto Rosas. *See, e.g., Winship*, 397 U.S. at 364; *Stump v. Bennett*, 398 F.2d 111, 119–20 (8th Cir. 1968). The question, though, is whether it was clearly established that the State shifted that burden by preemptively calling Rosas's alibi witnesses to discredit them and then commenting about it at closing argument. Rosas does not point to any Supreme Court case clearly establishing that, or why the belief that discrediting alibi witnesses preemptively was an unreasonable application of Supreme Court precedent. Instead, he points only to two appellate-court decisions. (ECF No. 103, at 80–82 (citing *United States v. Purvis*, 706 F.3d 520, 525 (D.C. Cir. 2013); and *United States v. Zuniga*, 6 F.3d 569, 570 (9th Cir. 1993))). Both do little to support his proposition that the State's actions here ran afoul of clearly established Supreme Court law about the Fifth and Fourteenth Amendments. In *Purvis*, the language quoted by Rosas actually comes from another case it is quoting, and there the Court made clear that the alibi

11

1 instruction was necessary because "the trial court expressing invited a weighing exercise by

2 instructing jurors to 'analyze the testimony presented by [the defendant] in contradistinction to the

3 testimony presented by the government' regarding the defendant's alibi defense." 706 F.3d at 525

4 (quoting *United States v. Alston*, 551 F.3d 315, 317 (D.C. Cir. 1976). In *Zuniga*, the defendant put

5 forth witnesses trying to establish an alibi and requested an instruction; the trial court refused. 6 F.3d

6 at 570. The court based its holding on the fact that "[a] defendant is entitled to an instruction

7 concerning his [or her] theory of the case if it is supported by law and has *some foundation in the*

8 *evidence.*" *Id.* (second alternation in original) (citation omitted). The decision was not about burden

9 shifting.

10         Ground 3 provides no basis for habeas relief.

11 **D.    Ground 4**

12         In Ground 4, Rosas argues he was "denied his right to the effective assistance of appellate

13 counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel

14 failed to [challenge] the prosecution's use of a peremptory challenge to exclude a Hispanic from

15 serving on the jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986)." (ECF No. 68, at 34). To

16 succeed on a typical ineffective assistance of counsel claim on direct appeal, a defendant must show

17 that counsel's representation fell below an objective standard of reasonableness and a "reasonable

18 probability that but for counsel's unprofessional errors, the result of the proceeding would have been

19 different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Courts evaluate a counsel's

20 performance from counsel's perspective at the time and begin with a strong presumption that

21 counsel's conduct well within the wide range of reasonable conduct. *See, e.g., Beardslee v.*

22 *Woodford*, 358 F.3d 560, 569 (9th Cir. 2004). When a state court has reviewed a *Strickland* claim, a

23 federal court's habeas review is "doubly deferential"—the reviewing court must take a "highly

24 deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d).

25 *Cullen*, 563 U.S. at 190, 202.

26         After the prosecutor exercised his third peremptory strike to remove Rosemarie Garcia from

27 the jury, Rosas's defense counsel "note[d] that she is the only Hispanic person on the jury" and

28 12

"challenge[d] the District Attorney's decision to eject her." (Exhibit 81, at 166). The prosecutor put forth several nondiscriminatory reasons for striking her: that, as was common practice, when they passed the jury lists around to law enforcement agencies, she got two "no" marks and "no" marks were not exclusively or always used on minorities; she knew a witness in the case; she worked at a store where other employees were just prosecuted for helping their friends commit theft from the store; and that, when the state's burden of proof was described, he "thought Ms. Garcia agreed with that sentiment" and "saw her smile or otherwise give some acknowledgment to that." (*Id.* at 166–67). He also noted that "she is not the only member of the Hispanic culture that exists [on the jury] unless somehow or another somebody [sic] redefines Hispanics to exclude Spanish-Basques" and that he believed that were at least two Spanish-Basques and one other Hispanic with an Anglo name remaining on the jury. (*Id.* at 167–68). The trial court confirmed the prosecutor's perception of Garcia's reaction to the burden of proof: "There was something I thought was kind of odd, but I suppose facial gestures are subject to varying interpretations." (*Id.* at 169). The court ended up deciding against Rosas. (*Id.* at 176).

Rosas argues that the fact that law enforcement agencies marked "no" does not say anything about whether they marked no on Garcia due to her race. Rosas argues that Garcia's "knowing" one of the witnesses is unsupported by the record "because Ms. Garcia actually did not know [the witness]. Ms. Garcia said only that the [witness's name] 'rang a bell' but that she has 'never known him personally or anything.'" (ECF No. 103, at 94). Rosas argues that the working at a store that has several employees prosecuted for theft for the District Attorney's office did not mean anything because Garcia "had no involvement in the criminal activity." (*Id.* at 95). Lastly, Rosas argues that the observation of her facial expression is meaningless because the State never followed-up on either its meaning with Rosas or on her understanding of the proper burden of proof.

The Nevada Supreme Court rejected Rosas's contention that these arguments showed that the prosecutor's given reasons were pretextual. (Exhibit 186, at 7–9). Doing so was not an unreasonable application of *Strickland* given the weak arguments that Rosas throws against the prosecutor's race-neutral justifications.

1     Ground 4 provides no basis for habeas relief.

2 **E.**     **Ground 5**

3     In Ground 5, Rosas argues that he "was denied his right to the effective assistance of trial

4 counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel

5 failed to move for a change of venue after a prospective juror informed the court and counsel that

6 Elko, Nevada's white and Mexican communities were racially split as to Rosas' guilt of the crimes

7 charged, the former favoring convictions and the latter acquittals." (ECF No. 68, at 38). As

8 discussed above, this Court therefore held this Ground would be "dismissed with prejudice unless

9 petitioner can show cause and prejudice to excuse the procedural bar, or that this Court's failure to

10 consider the defaulted claims will result in a fundamental miscarriage of justice." (ECF No. 86, at

11 10). The cause and prejudices standards are discussed more fully in the discussion of Ground 1,

12 above.

13     Rosas cites *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to overcome this default. *Martinez*

14 held that "'a procedural default will not bar a federal habeas court from hearing a substantial claim of

15 ineffective assistance at trial if' the default results from the ineffective assistance of the prisoner's

16 counsel in the collateral proceeding." *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (quoting

17 *Martinez*, 566 U.S. at 17). The standards for ineffective assistance of counsel are laid out in Ground

18 4, above. Proving ineffective assistance at the collateral proceeding, though, is not just as simple as

19 showing that there was a meritorious claim that should have been raised. Because "[e]ffective

20 appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those

21 arguments most likely to succeed[,] [d]eclining to raise a claim on appeal . . . is not deficient

22 performance unless that claim was plainly stronger than those actually presented to the appellate

23 court." *Id.* at 2067 (citation omitted). If the state court failed to address the ineffective assistance of

24 counsel claim because it held them to be procedurally defaulted, as here, then the federal courts

25 review the claim de novo.

26     The State responds that Rosas failed to cite *Martinez* as a method of overcoming the

27 procedural default in its opposition to the State's motion to dismiss because of procedural default.

28

Rosas admits that he "failed to list th[is] claim[] in his opposition," but argues that this Court should ignore this lapse because "this Court ordered further briefing on [whether Ground 5 overcame the procedural default] and Mr. Rosas never waived this argument." (ECF No. 103, at 97 n.24). Because this Court finds that Rosas has failed to meet his burden under *Martinez* even if he properly raised it, the Court need not address this issue.[4]

But Rosas's ineffective assistance of counsel claim fails on the merits on de novo review, as does the necessary claim that post-conviction counsel was ineffective for not raising the ineffectiveness of trial counsel claim. Everyone is entitled to trial by "a panel of impartial, indifferent jurors." *Irwin v. Dowd*, 366 U.S. 717, 722 (1961). He argues that he would have been granted a change of venue and because he was not, he "was tried before a jury that was not fair and impartial." (ECF No. 68, at 39). To succeed on this Ground, Rosas must show that his appellate counsel was ineffective for failing to raise a "substantial" claim that his trial counsel was ineffective failing to move for a change of venue, and that he was prejudiced as a result of his appellate counsel's failure.

Rosas is a "member of the Latino Hispanic racial group" and the "victims of the Domino's Pizza killings were white." (ECF No. 68, at 38). His claim boils down to the idea that, if there is racial tension in a town according to a single juror, then every competent attorney would file a motion for a change of venue. According to one juror, the town was divided along ethnic lines as to guilt and innocence, with the majority of Hispanics thinking that Rosas was not guilty and the majority of whites thinking that he was. If Rosas is truly arguing that any racial divide necessitates a motion for a change of venue, then O.J. Simpson should count his blessings that Rosas wasn't there to advise his lawyers. (*See* ECF No. 68, at 39 ("In light of . . . the presence of an all white jury, defense counsel should have moved for a change of venue.")). Perhaps, then, Rosas is arguing that because the jury was not as Hispanic as it could have been, as opposed to the predominately African-American jury that O.J. got, the attorney should have moved for a new venue. Besides likely

_____

[4] Same too with Ground 6.

15

violating the jurors' constitutional rights, such a move would be better treated as a fair cross-section claim. Such a claim is not "substantial" under *Martinez*. Similarly, post-conviction counsel was not ineffective for not raising this claim. Representing himself, Rosas's first post-conviction petition raised seventeen claims for relief. (Exhibit 149). Post-conviction counsel was then appointed, which filed a supplement raising two additional claims. (Exhibit 156). This race-based change of venue error, subject to the deferential standards of *Strickland*, was not plainly more meritorious than those actually raised. Therefore, Failing to raise a claim during post-conviction proceedings that trial counsel was ineffective by failing to move for a change on venue in light of racial tensions is not ineffective assistance of post-conviction counsel.

Rosas's next argument is that counsel was ineffective for not moving for a change of venue in light of the fact that a majority of the jurors had heard of the case.

This Court previously held that this Ground "related back" to the original petition for a writ of habeas corpus. (ECF No. 46, at 11). This court *sua sponte* clarifies that decision, and holds that the pre-trial publicity argument supporting a change of venue does not "relate back" to the original petition. AEDPA has a one-year statute of limitations. *See* 28 U.S.C. § 2244(d). When petitions are filed outside the one-year statute of limitations, only the grounds and arguments that "relate back," as allowed under Federal Rule of Civil Procedure 15(c)'s definition of an "amendment that asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out . . . in the original," to the original petition filed within the statute of limitations are timely. *See Mayle v. Felix*, 545 U.S. 644, 656, 663 (2005). "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Id.* at 664; *see also* 3 J. Moore, et al., *Moore's Federal Practice* § 15.19[2], pp. 15–82 (3d ed. 2004) (noting that relation back ordinarily allowed "when the new claim is based on the same facts as the original pleading and only changes the legal theory"), *cited by Mayle*, 545 U.S. at 644 n.7.

The original petition argued that trial counsel should have moved for a change of venue based on the reasoning discussed above—i.e., racial tensions. In its response to the State's motion to dismiss, Rosas cited Grounds Eight, Ten, and Seventeen of the original petition was establishing the

16

operative facts for his current claim that "he received ineffective assistance of trial counsel when counsel failed to move fora change of venue given the racially motivated split of opinion regarding Rosas' guilty or innocence among the Hispanic and White communities in Elko, Nevada." (ECF No. 41, at 21). Grounds 8 and 17 were fair-cross-section challenges based on race and *Batson* challenges based on race, both of which combined to "prevent[] [Rosas] from receiving a fair trial by a jury of his peers." (ECF No. 7, at 17, 37). Ground 10 was a general challenge to ineffective assistance of counsel. (*Id.* at 21). In his opposition to the State, Rosas characterized those claims as going to the "practicality of being of Mexican descent and being tried by an all-white jury" whose feelings of guilt or innocence "was strictly divided along racial lines." (ECF No. 41, at 21). At the end of his discussion, Rosas mentioned the newspaper articles for the first time and added a brief characterization of the newspaper articles as being "in support of Rosas['s] allegation of the racial divide in Elko, Nevada, as it specifically pertained to the White community's belief in his guilt and the Hispanic community's belief in his innocence." (ECF No. 41, at 21). In this Court's original order, it characterized the change of venue along racial lines, but never mentioned the newspaper articles. Thus, the consideration of the newspaper articles is limited to the extent that it addresses the common thread running between Grounds 8 and 17 of the original petition: race. Race-based facts are the same as given in the original petition. Facts based on pretrial publicity and a tainted jury pool, though, are based on an entirely different set of facts—facts that require investigation into the publicity given by the media, as opposed to the racial prejudices of the jury. Complaints based on pre-trial publicity "depend upon events separate in both time and type from the originally raised episodes" of *Batson* and an inadequate cross-section. *Mayle*, 545 U.S. at 657; *see also Alfaro v. Johnson*, 862 F.3d 1176, 1184 (9th Cir. 2017) ("Because Alfaro has not previously alleged facts regarding *systemic* delay in California's post-conviction death penalty process, her claim does not relate back to her timely-filed petition.").

Even if this Court were to hold that the discussions about pretrial publicity related back to the claims about fair cross-sections and *Batson*, the argument would fail on its merits. Courts have acknowledged that a "trial court my be unable to seat an impartial jury because of prejudicial pretrial

17

1   publicity or an inflamed community atmosphere." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.

2   1988). But case law "cannot be made to stand for the proposition that juror exposure to . . . news

3   accounts of the crime . . . alone presumptively deprives the defendant of due process." *Skilling v.*

4   *United States*, 561 U.S. 358, 380 (2010) (alterations in original) (citation omitted). "A presumption

5   of prejudice . . . attends only the extreme case." *Id.* at 381. On federal habeas, courts have the

6   obligation to "independently examine the exhibits containing news reports about the case for

7   volume, content, and timing to determine if they were prejudicial." *Harris*, 885 F.2d at 1360.

8        Rosas points to next to nothing, beyond the fact that a "good percentage" of jurors had *heard*

9   of the case, to justify the idea that there was excessive pretrial publicity . (*See* ECF No. 193, at 100,

10   102; Exhibit 81, at 55, 107–08, 111–12, 120, 124–26, 131, 134, 141). The newspaper articles

11   presented by Rosas to this Court do not raise any specter of impartiality from the jurors. (*See* Exhibit

12   195 at 3, 5, 7). And nothing to show that a reasonable attorney in trial counsel's shoes would have

13   thought it better to try to temperaments of out-of-towners over in-towners who have read a

14   newspaper, but who otherwise demonstrated no prejudice against the defendant or inability to serve

15   as impartial jurors. This does not come close to meeting Nevada's test of "publicity corrupt[ing] the

16   trial," and thus trial counsel could have easily thought that his motion would have been fruitless.

17   *Sonner v. State*, 930 P.2d 707, 712 (Nev. 1996). Indeed, Rosas fails to demonstrate any prejudice.

18   Failing to raise a claim during post-conviction proceedings that trial counsel was ineffective by

19   failing to move for a change on venue in light of the crime having been in covered by the media is

20   not ineffective assistance of counsel. Therefore, Rosas cannot demonstrate cause under *Martinez* to

21   excuse the procedural default.

22        Ground 5 provides no basis for habeas relief.

23   **F.**    **Ground 6**

24        In Ground 6, Rosas argues that he "was denied his right to the effective assistance of trial

25   counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel

26   failed to investigate (1) a leading suspect in the killings and (2) a witness who could have impeached

27   Liana Marie Barraza, and therefore, failed to prepare a meaningful defense." (ECF No. 68, at 40).

28                                      18

Ineffectiveness of trial counsel and appellate counsel are addressed using the same standards as discussed above in Ground 5. To overcome the procedural hurdle under *Martinez* discussed in Ground 5, above, Rosas needs to show that his post-conviction counsel was ineffective for failing to raise the claims for the alleged ineffectiveness of trial counsel, all of which is reviewed de novo.

Rosas contends that post-conviction counsel was ineffective for failing to raise the claim that trial counsel was ineffective for failing to investigate whether J.J. Horner committed the double homicide for which Rosas was on trial. The crux of Rosas's argument is that, if trial counsel has investigated Horner, he would have discovered that Horner, in violation of federal law, owned at least one 9mm pistol (the same caliber used in the homicide and owned by millions of Americans across the country), that Horner had been investigated for allegedly stealing dynamite from a company whose employees wore blue jackets (the same color jacket likely worn by the shooter and owned by millions of Americans across the country), and that Horner had been investigated for allegedly threatening to use the dynamite against governmental agencies (unlike almost every other American across the country, but is, safe to say, fairly unrelated to the double homicide at Domino's). (*See* ECF No. 103, at 108). Moreover, Horner claimed that he was with Rosas on the night of the homicides, so their connection might not have been good for the defense. (Exhibit 201, at 3). The odds that such revelations would have influenced the outcome of the proceeding is quite low, as discussed below in Ground 7, and so there is no prejudice and the ineffective assistance of counsel at trial claim was weak. *See Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000) (finding prejudice when the other-suspect information created a substantial probability that the state's theory of guilt was wrong; *Hamilton v. Vasquez*, 17 F.3d 1149, 1157 (9th Cir. 1994). And because of this low probability of success, post-conviction counsel was not ineffective for failing to raise the ineffectiveness of trial counsel claim. Therefore, Rosas cannot demonstrate cause under *Martinez* for this claim of ineffectiveness. And even if he could and this Court were to address the ineffective assistance of trial counsel claim on the merits, it would fail for the reasons just discussed.

Rosas also contends that post-conviction counsel was ineffective for failing to raise the claim that trial counsel was ineffective for failing to investigate a witness, Ford, whom Rosas contends

19

could have helped impeached Barraza, a witness of the State. Much, but not all, of Barraza's testimony was corroborated by other witnesses called by the State. (*See infra* Ground 9).

In his Second Amended Petition, Rosas states that "If Ms. Ford had been called at trial she and provided [the testimony that Ford and another women went to Rosas's motel room on May 24 between 5:00 and 5:30 am and did not see Barraza there], the jury would have had reasonable doubt as to the credibility of Ms. Barraza." (ECF No. 68, at 42). Indeed, Barazza did testify that she was with Rosas at a different motel throughout the evening of May 23 and the morning of May 24, except for a couple of hours—roughly the time window when the State argued the homicides took place. (Exhibit 100, at 1422–95). Rosas's trial counsel knew about Ford and her story. (*See* Exhibit 201, at 2–3). Rosas argues that it was ineffective assistance of counsel to not investigate that story further to corroborate it and thus be able to use it to impeach Barraza or to investigate Barazza's criminal record and use it to impeach her. Trial counsel, though, opted to attempt to impeach Barraza through an alternative means, including questioning why she was willing to keep hanging out with Rosas notwithstanding his confession to her that he committed the homicides. (*See* Exhibit 232, at 114, 117). Even assuming that these failures amounted to ineffective assistance of counsel does not give Rosas relief. It is a question whether Rosas was prejudiced by this lack of further investigation—*i.e.*, whether trying to impeach Barazza's testimony with a potential inconsistency that occurred several hours after the shooting and a substantial portion of time before the Rosas made the statements to her that she relayed in court concerning his guilt would have a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As discussed in more detail in Ground 9, below, the vast majority of Barazza's testimony was corroborated by one or two other people. Therefore, Rosas has not established such a "reasonable probability" of a different trial outcome.

Ground 6 provides no basis for habeas relief.

## G. Ground 7

In Ground 7, Rosas argues that the "State's failure to disclose (1) the prosecution of J.J. Arnold Horner as an ex-felon in possession of a 9mm pistol during the summer of 1997, and its

20

consequent seizure of such 9mm pistol and destruction thereof at closure of the case and (2) the investigation of Horner for stealing dynamite and threatening various persons and institutions with it denied Rosas his rights to due process of law and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution." (ECF No. 68, at 43). In other words, he contends that the State failed to disclose two pieces of information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963): First, that J.J. Horner was being prosecuted for being a felon in possession of a 9 mm pistol. Second, that J.J. Horner was being investigated for stealing dynamite and threatening to use it to against government entities. The Nevada Supreme Court held that the petition was procedurally barred, untimely, and an abuse of the writ. (Exhibit 247). This Court then held that Ground 7 was procedurally defaulted based on independent and adequate state grounds, and that, after the merits issues were fully briefed, it would be "dismissed with prejudice unless petitioner can show cause and prejudice to excuse the procedural bar, or that this Court's failure to consider the defaulted claims will result in a fundamental miscarriage of justice." (ECF No. 86, at 10).

Rosas contends that Ground 7 is not defaulted "because in the context of considering whether Mr. Rosas could demonstrate cause and prejudice, the state court decided this claim on its merits." (ECF No. 103, at 134). *Brady* requires the disclosure of evidence that is both favorable to the accused and "material either to guilt or punishment." *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citation omitted). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 681; *see also Kyles v. Whitney*, 514 U.S. 419, 435 (1995) ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

The Nevada Supreme Court rejected Rosas's *Brady* claim in the final round of state post-conviction proceedings. After noting that "[e]vidence is material where there is a reasonable probability that the omitted evidence would have affected the outcome of the trial," the court held:

21

"This court has only been provided with trial transcripts for portions of days two, seven, and eight of the guilty phase of the jury trial so that we cannot review the district court's conclusion that the evidence was not material." (Exhibit 247, at 4). It quotes one of its decisions for the proposition that "[t]he burden to make a proper appellate record rests on the appellant." (Exhibit 247, at 4 (quoting *Green v. State*, 612 P.2d 686, 688 (Nev. 1980))). It therefore rejected Rosas's claim.

Contrary to Rosas's assertion, that is not deciding the claim on the merits. Instead, that is saying that the state court could not decide the claim on the merits because Rosas procedurally erred by not providing it with the record necessary to make the materiality determination. Rosas argues that, even if the Nevada Supreme Court did not decide Ground 7 on its merits, the "bar the state court applied . . . was not independent of federal law and therefore cannot bar federal review." (ECF No. 103, at 120). But it was: the Nevada Supreme Court required Rosas to "make a proper appellate record," which Rosas failed to do because he supplied only portions of the transcripts of a few days of the jury trial. That is a reasonable state procedural rule—divorced from the substance of the federal grounds. If a state court were unable to require defendants to provide the plea agreement when they challenge its terms or the voir dire transcript when they make a *Batson* challenge, everything would be decided de novo by federal habeas courts. That is not what AEDPA intended. Rosas further argues that requiring the trial transcript is contrary to clearly established law because "'other suspect' evidence is 'classic *Brady* material.'" (*Id.* at 121 (quoting *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010))). But "classic *Brady* material" does not mean "always material *Brady* material."

Rosas further argues that this procedural default can be overcome because the State suppressed the factual basis for it. (*Id.* at 122). Rosas is correct that if the *Brady* material came to light after the reason for the procedural default occurred and the procedural default was attributable to not having the *Brady* material, then that would constitute cause to overcome the default. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). But the default here was failing to provide the Nevada Supreme Court with full trial transcripts to prove the *Brady* violation—the only connection that has to the alleged *Brady* violation is that the State had to withhold some evidence for Rosas to file a

*Brady* claim in the first place. The State's withholding of evidence does not explain or excuse Rosas's failure to provide the Nevada Supreme Court with a complete record to determine whether the State's witholding of evidence violated *Brady*.

And even if the Nevada Supreme Court did rule on the merits, then this Court is limited to reviewing the evidence presented to the Nevada Supreme Court or otherwise excused. *See* 28 U.S.C. § 2254(d), (e). Because that evidence includes only portions of the trial transcript, this Court cannot conclude that there is a reasonable probability that the evidence not turned over, described below, would have changed the outcome. *See Bagley*, 473 U.S. at 681. Rosas bears the burden of proof of establishing that he is entitled to habeas relief, and he has failed to meet that burden based on the evidence that this Court is allowed to view. *See Pinholster*, 563 U.S. at 181. Again, the fact that something is "classic *Brady* material" does not mean it is always material *Brady* material. While there might be instances where a court would not need any trial transcripts to determine if the failure to turn over some evidence had a reasonable probability of changing the outcome, the evidence here is much too weak to fall into that category.

What is more, looking at the whole trial court record shows that the material Rosas points to did not have a reasonable probability of changing the outcome of the proceedings. That Horner owned a weapon of the same caliber as the one used in the murders, but which Rosas concedes and the state trial court determined could not have been used in the murders, and that he stole dynamite from a place whose employees wore the same color jacket as the shooter wore, is almost meaningless. Evidence that Horner might have threatened to blow up governmental buildings with dynamite does not do much either—in fact, it quite possibly could have been excluded under Nevada's evidence code. *See* Nev. Rev. Stat. § 48.035. The jury was already aware the Horner had a criminal history, had been incarcerated, bought and sold drugs, and was acquaintances and business associates with Rosas. (*See* Exhibit 96B, at 1240–47). Moreover, Horner testified that he was with Rosas the night of the Domino's killing. (*See id.* at 1247). Therefore, the incremental evidence forming the basis for Rosas's *Brady*'s claim is not material. (*See also infra* Ground 9). Evidence is not material by virtue of the fact that it is about someone whom some thought to have committed the

23

1    crime. (*See* Exhibit 197). It still has to undermine confidence in the jury verdict—this evidence does
2    not.

3         Ground 7 provides no basis for habeas relief.

4    **H.    Ground 8**

5         In Ground 8, Rosas argues that the "[a]dmission of prior bad act testimony violated [his]
6    constitutional rights to a fair trial and due process of law under the Fifth, Sixth, and Fourteenth
7    Amendments to the United States Constitution." (ECF No. 68, at 44). In the context of a
8    conversation about how Rosas discussed Katie Riley "shorting" him on a drug transactions, a
9    prosecution witness mentioned on direct examination that Rosas said that "if [Riley] keeps doing
10   that and this and that dadadadada, he asked [the witness] if [the witness] would beat [Riley] up for
11   [Rosas]." (Exhibit 100, at 1434–36). Defense counsel then objected, and the trial judge admonished
12   the jury to disregard it. (*Id.*). The prosecutor then firmed up when this conversation took place, and
13   moved on. (*See id.* at 1437–38). Rosas argues that this constitutes "bad act testimony." In light of
14   the fact that the State's theory was that Rosas committed the murders partially because someone at
15   Domino's owed him $400 for a drug debt, (*see* Exhibit 14, at 224–27, 238–39), Rosas argued that
16   "[t]he inference left with the jury by [the] testimony could only be that a man who is willing to have
17   a woman assaulted over a drug deal would be capable and willing to murder, or have murdered, a
18   man who owed money for drugs." (ECF No. 68, at 45–46). He further contends that any curing done
19   by the judge's admonition was eradicated when the prosecutor asked the witness, after that, when the
20   conversation took place. (*Id.* at 46).

21        In bullet-point form, Rosas then lists nine other instances of "additional bad act evidence
22   [that was] improperly admitted against Rosas." (*Id.* at 46–47). These included other conversations
23   about how Riley or others shorting Rosas's customers, that Rosas appeared to be under the influence
24   of narcotics the day after the homicides, that Rosas sold drugs, that Rosas brandished a firearm while
25   conducting drug activity the night of the homicides, that someone was physically intimidated by
26   Rosas, and that Rosas had fronted someone drugs. (*See id.*; *see also* Exhibit 88, at 657, 679–89, 699,
27   703, 713; Exhibit 91, at 826–28, 931–37, 945, 977; Exhibit 93, at 1009, 1015–20; Exhibit 96, at

28                                                     24

1246, 1250–51, 1261–70).

The federal courts "are not a state supreme court of errors; we do not review questions of state evidence law." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Instead, the federal courts on habeas review care only "whether the admission of the evidence so fundamentally infected the proceedings as to render them fundamentally unfair," and thus constitutionally impermissible. *Id.* Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Id.* at 920 (citation omitted). Whether the admission of evidence violated state law "is no part of a federal court's habeas review of a state conviction." *McGuire v. Estelle*, 502 U.S. 62, 67 (1991). In other words, the evidence is not constitutionally suspect unless it is irrelevant and has no probative value. *See id.* at 68–69.

The Nevada Supreme Court held that Rosas's right to a fair trial was not denied based on these statements. (Exhibit 138, at 3, 6–8). This was not contrary to clearly established federal law. All of the challenged testimony was admitted for a permissible purpose, whether it be to show Rosas's motive or to show that he was in the process of dealing with people stealing from him. Moreover, it is not clearly established that character evidence is "impermissible" in a constitutional sense. *See Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006); *Williams v. Neven*, No. 2:14-cv-1506-APG, 2016 WL 6246769, at *3 n.7 (D. Nev. Oct. 25, 2016). Indeed, some of the evidence Rosas complains should not even be characterized as bad act evidence, such as the fact that he was seen brandishing a gun the night of the murder.

As mentioned above, Rosas's core contention for this Ground is that the Riley testimony was "highly prejudicial and inflammatory." (ECF No. 103, at 125). Not only was the jury instructed to ignore that testimony, but also it served a constitutionally permissible purpose: demonstrating that Rosas was willing to at least talk about using physical force when it came to money. While that might have violated state or federal rules of evidence, neither are clearly established Supreme Court case law about the right to a fair trial.

Regardless, though, of whether any of the evidence had a constitutionally permissible purpose, the admission of none of it was "of such quality as necessarily prevent[ed] a fair trial,"

25

*Jammal*, 926 F.2d at 920 (citation omitted), and the Nevada Supreme Court's decision was not contrary to any clearly established Supreme Court law.

Ground 8 provides no basis for habeas relief.

## I. Ground 9

In Ground 9, Rosas argues that he "was denied his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution because there was insufficient evidence presented at trial to support a finding of guilt of the crimes charged beyond a reasonable doubt." (ECF No. 68, at 47). This argument hinges on *Jackson v. Virginia*, 443 U.S. 307 (1979), where the Supreme Court held that due process does not allow a conviction if, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The Nevada Supreme Court cited this standard but held that it was not met. (Exhibit 138, at 3–6). On federal habeas review, this Court combines the deferential standards of *Jackson* with the deferential standards of AEDPA to approach the claim that the Nevada Supreme Court got it wrong with a "double layer of deference." *Smith v. Mitchell*, 624 F.3d 1235, 1239 (9th Cir. 2010). Therefore, Rosas "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

Rosas's petition on this front is predominately made up by pointing to what evidence *wasn't* in the record:

> There was no forensic evidence whatsoever linking Rosas to the crime. There was no identification testimony from the sole witness at the scene describing Rosas as the assailant. There was no evidence that Rosas had any prior knowledge or contact with any of the victims or anyone else at the Domino's Pizza in Elko, Nevada. . . .
> [Summarizing the State's theory that if someone wanted to talk to police incognito, all they had to do was call for a Domino's delivery.] There was no evidence that [the officer doing those knock and talks] ever made a delivery to Rosas' residence, a place where Rosas was or to anyone Rosas even knew.
> The Domino's killings were committed with a 9mm pistol. There was no evidence that Rosas ever owned such a pistol.

(ECF No. 68, at 48). As to the affirmative evidence, apparently, it "was largely hearsay admitted as admissions [made by Rosas]." (*Id.*).

That is not an accurate characterization of the evidence presented by the State against Rosas.

When the evidence is properly viewed, it is clear that the Nevada Supreme Court did not make an unreasonable determination of fact or contravene clearly established U.S. Supreme Court case law in rejecting Rosas's sufficiency-of-the-evidence claim. Eyewitness testimony of the shooting describes a shooter that a jury could have reasonably found comports with Rosas. (*See* Exhibit 83, at 334–62). Rosas admitted to his then-girlfriend that he committed the murders and asked her to provide him with an alibi. (Exhibit 100, at 1425–32). Rosas also told her that one of the victims owed him either $200 or $400, and $400 was taken from the cash register at Domino's, but additional sums remained. (*Id.* at 1430–33). That $400 figure was backed up by other witnesses, and three witnesses claimed that Rosas told them that someone at Domino's owed him $400 and that he killed or was going to kill someone at Domino's because they owed him money. (Exhibit 104, at 1655, 1659–61). Rosas was seen brandishing a pistol the night of the murders. Several people purported that Rosas was with them during the time of the shooting, but the prosecution impeached them with inconsistencies in their stories or outright admissions of lies—that people were willing to claim as much, but be impeached, could be interpreted against Rosas by a rational jury, especially in light of the fact that there was testimony that Rosas asked his then-girlfriend to lie and provide him with an alibi. (*See, e.g.*, Exhibit 83, at 230–35; Exhibit 91, at 941–50, 1025; Exhibit 93, at 1016–25, 1050–53, 1082–83, 1123–42; Exhibit 104, at 1664–69). Evidence was introduced showing that Rosas and another person had multiple conversations in which one would ask the other, "do you think they're really dead" and the other said "I made sure." (Exhibit 104, at 1649). Evidence was introduced that a Domino's delivery person would use deliveries as a way of talking to people and trying to spot drugs during the delivery process, i.e., a secretive knock-and-talk, and that Rosas wanted to set an example of prohibiting this kind of behavior by killing people at the Dominos. (*Id.* at 1656–57). Indeed, other evidence was that Rosas claimed that he "wanted to make an example" of someone, and a jury could have inferred that was the Domino's manager. And the idea that Rosas would kill someone was solidified by testimony from witnesses who claimed intimidation or bribery. (*Id.* at 1658–59).

Lastly, Rosas complains that "the trial court never instructed the jury on [the element that the defendant could have exercised control over the weapon] for a deadly weapon enhancement." (ECF

27

No. 103, at 153; *accord* ECF No. 68, at 49). That, though, is not the issue because the question is whether a rational tried of fact could have found the elements beyond a reasonable doubt. Based on the evidence presented above, a rational trier of fact could have so found, and the Nevada Supreme Court decision does not warrant correction under AEDPA.

Ground 9 provides no basis for habeas relief.

**J.    Ground 10**

In Ground 10, Rosas argues that he "was denied his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution when counsel failed to object to the joinder of the controlled substances conspiracy charge (Count 9) with the previous eight counts concerning the Domino's Pizza killings." (ECF No. 68, at 49). Nevada state law allows joinder of offenses if they offenses are "based on the same act or transaction" or "[b]ased on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Nev. Rev. Stat. § 173.115.

The standards for ineffective assistance of counsel are discussed above. Rosas was prejudiced, he claims, because the inclusion of count 9, which was about a drug conspiracy, "highlighted to the jury during all phases of the case" his "status as a drug dealer." (ECF No. 68, at 49). His status as a drug dealer was highlighted throughout the case not only because of count 9, but also because it was central to the State's explanation of his motive for the crimes. Therefore, any error was harmless. *See Chapman v. California*, 386 U.S. 18, 24 (1967). Moreover, even if not harmless, there is a very good argument that it is and that trial counsel and appellate counsel would have thought not only that raising the claim would not benefit Rosas in any way, but that it would hurt Rosas because he would have to endure two trials. Therefore, there could be no ineffective assistance of counsel claim.

The claim fails for yet another reason: the Nevada Supreme Court held that a motion to sever would not have been granted. (Exhibit 186, at 3). In other words, the Nevada Supreme Court interpreted the Nevada state statute to not allow severance here, and therefore even if Rosas's trial counsel had moved for severance, it would not have worked. Therefore, he cannot demonstrate

28

1  prejudice. State court determinations of state law are not proper subjects of federal habeas petitions.

2  *See Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine

3  state-court determinations on state-law questions."). Not only is the state court's interpretation

4  outside the scope of this Court's review, but also the interpretation is reasonable based on the

5  interrelatedness of the drug conspiracy and the double homicide in furtherance of Rosas's drug

6  business.

7       Ground 10 provides no basis for habeas relief.

8                                   **Conclusion**

9       Accordingly, IT IS HEREBY ORDERED that **Rosas's petition for a writ of habeas corpus**

10  **is DENIED** on the merits, and this action is **DISMISSED with prejudice.**[5]

11      Because reasonable jurists would not find this decision to be debatable or incorrect, IT IS

12  FURTHER ORDERED that a **certificate of appealability is DENIED**. The Clerk of Court is

13  directed to **enter judgment, in favor of respondents and against Rosas, dismissing this action**

14  **with prejudice**.

15      DATED August 22, 2017.

16

17  _____

18  Robert C. Jones
    United States District Judge

19

20

21

22

23

24

25  _____

26  [5] A petitioner may not use a reply to an answer to present additional claims and allegations that are not
    included in the federal petition. *See, e.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).
27  To the extent that Rosas has done so in his federal reply, this Court does not consider these additional
    claims and allegations.

28                                   29